THEODORE F. CHILDS, Appellant, *v.* WESLEYAN CEMETERY ASSOCIATION, Respondent.

### May 15, 1877.

1. Equity will not presume a trust reserved in the grantor, but the proof of it must be clear. The mere expectation of a grantor that the premises granted would be used for certain purposes will not be construed into a reservation of the premises to himself if it should be used for other and different purposes.

2. Where a consideration is paid, and no uses are expressly reserved in the conveyance, the grantee will take the whole use.

APPEAL from St. Louis Circuit Court.

*Affirmed.*

W. J. SHARMAN, for appellant: Uses and trusts. — Hill on Tr., 12th Am. ed., 162, 107; *Rutherford* v. *Taylor*, 38 Mo. 319; *Price* v. *Thompson*, 48 Mo. 365; 1 Cru. 399;

*Warrun* v. *Mayor, etc.*, 22 Iowa, 351; Perry on Tr. 134, 135, 144. Powers of corporations to acquire, hold, and sell realty.— Sess. Acts 1850–1, p. 130, sec. 2; *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Pacific R. Co.* v. *Seily*, 45 Mo. 220; *Perviur* v. *Commissioners*, 16 Ohio St. 370; *Carroll* v. *City of East St. Louis*, 67 Ill. 568. A trustee must comply strictly with the powers granted in the trust deed, or no title will pass at a sale under it.— *Powers* v. *Kunchoff*, 41 Mo. 425; *Longwith* v. *Butler*, 3 Gilm. 32; *Powell* v. *Tuttle*, 3 Comst. 396; *Greenleaf* v. *Queen*, 1 Pet. 138; *Norman* v. *Hill*, 2 Patt. & H. 676. Effect of undue influence, or abuse of trust. — *Turner* v. *Turner*, 44 Mo. 535; *Thornton* v. *Irwin*, 43 Mo. 153; *Davone* v. *Fanney*, 2 Johns. Ch. 269. Adverse possession.— *Warfield* v. *Lindell*, 30 Mo. 281. To whom and of what the record of a deed is constructive notice.— *Luby* v. *Wolf*, 10 Ohio, 83; *Crispin* v. *Hannanen*, 50 Mo. 344; *Digman* v. *McCullom*, 47 Mo. 372.

CLINE, JAMISON & DAY and W. F. CAUSEY, for respondent: Trusts and trustees. — *Lane* v. *Ewing*, 31 Mo. 86; Perry on Tr. 54, sec. 83; Hill on Tr. 65, 66, 85, 86; *Smith* v. *Walser*, 49 Mo. 250. Equity will not presume a trust reserved in the grantor. — *Adams* v. *Logan County*, 11 Ill. 336; Rev. Stat. Mo. 1845, pp. 219, 221, secs. 2, 14. No use can result to the grantor where the deed contains covenants of warranty. — Perry on Tr. 132; *Philbrook* v. *Delane*, 29 Me. 410; *Hogan* v. *Wilcher*, 14 Mo. 184. No use results to a donor. — *Good* v. *McPherson*, 51 Mo. 126; *Academy of Visitation* v. *Clemens*, 50 Mo. 167. Notice imparted by record of deed. — *Rhodes* v. *Oulcott*, 48 Mo. 367. Adverse possession a bar. — *Wall* v. *Shindle*, 47 Mo. 282; *Biddle* v. *Mellow*, 13 Mo. 335; *Scruggs* v. *Scruggs*, 43 Mo. 144; *Hunter* v. *Hunter*, 50 Mo. 451; *Poe* v. *Darnio*, 54 Mo. 127. Estoppel.— *Ohio & Mississippi R. Co.* v. *McPherson*, 35 Mo. 13; *Camp* v. *Byrne*, 41 Mo. 525; *Cattle* v. *Snyder*, 10 Mo. 763.

Hayden, J., delivered the opinion of the court.

This is a suit in equity, by which the appellant seeks to establish a title to certain real estate, which he claims, upon the facts of the bill, belongs to him.   There are two counts in the petition, the first relating to a tract known as the "Briggs tract," the second to a tract known as the "Ranken tract."   In reference to the first tract the appellant's claim is that it was conveyed by Nathaniel Childs, the father of the appellant, to the respondent, in trust, for the special purpose that the respondent would use it as a cemetery ; and that, the respondent having ceased to use it, and being now about to convert it to other and inconsistent uses, it should be restrained from such a violation of the trust, and that the rights of the appellant in the tract should be declared.   In reference to the "Ranken tract," the claim of the appellant is that, though his father, through whom he derives title to both tracts, permitted it to be enjoyed by the respondent so long as the tract was used as a cemetery, yet, as no deed was executed, no title passed, and now, such use being abandoned, the property should be declared the appellant's.   The respondent denied any title of the appellant in either tract, asserted property in itself, and the case was referred, for the trial of the whole issue, to a referee, who found, in substance, as follows :

1. That in the year 1847 N. Childs was a member of the Centenary Methodist Episcopal Church, South, and, being desirous to promote the interests of the church, he purchased, on May 27, 1847, from one Briggs, the property described in the first count ; that this purchase was made by N. Childs with the intent that it should be for the benefit of the church, but that it did not appear that Childs purchased the property as agent of the church, or under such circumstances as in law to make him its trustee, though Childs intended, and the church expected, the property would be held for it ; that soon after the purchase Childs established a cemetery on the ground, which

was known as the Wesleyan Cemetery, for the benefit of the Centenary Church; that on April 27, 1849, an instrument of writing was drawn up on behalf of the church, and executed and acknowledged, and put on record on August 13, 1849, in the recorder's office of St. Louis County, by N. Childs. In this instrument the acquisition by Childs of the two tracts of land is recited, and then follows this clause: " Both of which said pieces of land described in the two deeds aforesaid I purchased for the benefit of the Centenary Church, in the city of St. Louis, primarily; and secondarily for the benefit of the Methodist Episcopal Church, South, with which said Centenary Church stands connected." The instrument then states that, in consideration of the premises and $1, Childs binds himself, as soon as he shall have received and been reimbursed $2,240, the amount due by him upon the land, with legal interest and costs and expenses that he may incur about the premises, to convey the two tracts to the three trustees of the Centenary Church, for its use, and ultimately for the use of the Methodist Episcopal Church, South, and for such other uses and purposes and trusts as shall be agreed upon between him and the official body of the Centenary Church. The instrument states: " Upon the premises aforesaid there is laid off and established a cemetery, now known as the Wesleyan Cemetery, and it is expected that I shall be reimbursed and indemnified, as aforesaid, by the proceeds and incomes realized from the appropriating and using said premises for the purposes of such cemetery; " and contains a clause in which it is stated that the title, which Childs agrees to convey to the trustees of the Centenary Church, is all such title as acquired by virtue of the two deeds first recited.

The referee further found, as matter of fact, that Trusten Polk and others, with the consent and coöperation of said Nathaniel Childs, applied to the General Assembly of the State of Missouri for a charter creating a corporation capa-

ble of holding and using the real estate described in said
first count, and other real estate, for the purposes of a cem-
etery, and with a view to conveyance by said Nathaniel
Childs of the real estate described in said first count, to
such corporation, for the purposes aforesaid. And the said
General Assembly, yielding to said application, did pass the
said act, entitled " An act to incorporate the Wesleyan
Cemetery Association," which was approved on February
28, 1851.

On December 5, 1853, N. Childs and wife executed and
delivered to the respondent a deed, which was recorded
July 11, 1854, for the consideration of $1, in the form of
an absolute conveyance, without express uses, by which
they conveyed to the respondent all their right, title, and
interest to the " Briggs tract," except certain lots in it
which are not in the controversy. The referee found that
this deed was for such uses and purposes as the respondent
was authorized by its charter to hold and use the same for,
and executed with the intent that respondent should so use
and dispose of the land; that it was for the nominal con-
sideration of $1, which was never paid; and concluded
that the property was conveyed without the creation or res-
ervation of any trust for the benefit of Childs, and without
any intention or agreement to create or reserve any. It
was further found that, about the date of this deed, N. Childs
delivered the possession of the real estate in it described to
the respondent, and that the respondent has held and used
the same for the purpose stated in its charter, and from the
time it so received the premises has continued to have ac-
tual, open, and notorious possession thereof, to the time of
suit, and has claimed the same as owner and adversely, and
that such possession continued for more than twenty years
prior to the bringing of the suit.

The referee further found that on December 9, 1873, by
deed of that date, N. Childs conveyed all his estate and
interest in the " Briggs tract" to the appellant; but that,

inasmuch as there was no reservation in the deed of December 5, 1853, by way of trust or otherwise, to N. Childs, nor any understanding between N. Childs and respondent that any should be reserved, therefore the deed of December 9, 1873, conveyed no interest to the appellant, except as to the lots not in controversy; that the respondent received and held possession of the real estate conveyed to it as absolute owner, and not in any way as trustee for N. Childs.

2. As to the second cause of action, in reference to what is called the "Ranken tract," the referee found as follows: That the respondent was incorporated, as stated above; that the said Nathaniel Childs, on January 12, 1848, by deed of that date, acquired the title to the parcel of land described in the said second count, which land was acquired by him in his own right, and not as agent or trustee, but with the intention to turn the same over to the said Centenary Methodist Episcopal Church, South, to be used by said church, in connection with the parcel of ground described in the said first count, as a cemetery; that said Nathaniel Childs purchased the said parcel of land described in said count from one Robert Ranken, for the sum of $4,000, one-half of which he paid in hand, and for the other half he executed to said Ranken his promissory note, of the said date of January 12, 1848, payable in two years after date, and also two interest notes for $120 each, bearing the same date, and payable respectively in one and two years after date; and to secure the payment of the said notes the said N. Childs and his wife executed a deed of trust on the said parcel of land to William Milburn, and thereby conveyed the said premises to him upon the trust in said deed contained, — that should default be made in the payment of said notes, or either of them, when the same should become due, the said Milburn might proceed to sell the said tract of land, or any part thereof, at public vendue, to the highest bidder, at the court-house door in the city of

St. Louis, for cash, first giving thirty days' public notice of the time, terms, and place of said sale, and of the property to be sold, by advertisement in some newspaper printed in said city of St. Louis, and, upon such sale, should execute and deliver a deed in fee-simple of the property sold to the purchaser or purchasers thereof.

The referee found that the said Nathaniel Childs paid the note for $120 which was payable one year after date, referred to in said deed of trust, and that afterward, and before September 4, 1850, the said Childs was refunded, out of the proceeds of sales made by him of grave lots in said cemetery, all the sums of money he had paid on account of his purchase of the said land from the said Ranken, and also sums he had paid in the management and improvement of it; and that, on the said September 4, 1850, the said Nathaniel Childs, of the one part, and James Mackoy and others, acting on the part of the trustees of said Centenary Church, of the other part, entered into and executed an agreement in writing, the first part of which is as follows, to wit:

"This agreement, made by James Mackoy, John Hogan, and Edward J. Gay, a committee on the part of the trustees of the Centenary Church, on the one part, and N. Childs, of the other part, witnesseth: that said committee, having examined the accounts of the church and cemetery with said Childs, and having this day adjusted the same, do further agree and contract, on the part of said trustees, to hold harmless the said Childs from all personal liabilities he may now be under as the maker of a note for two thousand dollars, due the estate of Robert Ranken as the last payment on a portion of the cemetery ground, and also on notes given to Brewster and Hart for building of parsonage, which are understood to be yet outstanding to the amount of two thousand dollars. In consideration of which the said Childs hereby agrees to convey to the said trustees all right or title which he has, or may have, in the two tracts

of land purchased for cemetery purposes, and known as the Wesleyan Cemetery, and containing in all about thirteen and three-fourths acres of land; it, however, being fully understood between all parties that the said ground has always been held and managed by said Childs for the benefit of the church, and in fact was, and now is, intended to be the property of the church when the liabilities were paid off, as more fully specified in a bond executed by said Childs, April 7, 1849."

The agreement then sets out that the committee appoint Childs the agent of the board of trustees to manage the collection and sales of the cemetery grounds, under rules to be established by the board; provides that Childs shall report to the board, and that no payments or disbursements are to be made by him except upon the order of the auditor of accounts, etc. It was dated September 4, 1850, and signed by the committee and N. Childs.

The referee further found that the note for $2,000, and the note for $120, payable two years after date, mentioned in the deed of trust executed by said Childs, and above referred to, together with interest thereon, remained due and unpaid; and the said Wm. Milburn, in pursuance of the said deed, did, at the request of the holder of said notes, on August 8, 1850, and for thirty days thereafter, give thirty days' public notice, by advertising in the *Missouri Republican*, a newspaper printed in said city of St. Louis, that he would proceed to sell the parcel of ground in said deed of trust and said advertisement described, at public vendue, to the highest bidder, at the east front door of the court-house in said city of St. Louis, for cash, on Monday, September 9, 1850, between the hours of ten o'clock in the forenoon and four o'clock in the afternoon of that day, and that the said Milburn did, on said day, and between said hours, at said place, expose to sale, and did sell, according to the terms of said advertisement, the said parcel of ground, to Trusten Polk and John

Hogan, the highest bidders therefor, for the amount of the said two notes and interest due thereon, and of the cost and expenses of the trust; and the said Milburn afterwards, on the payment of the amount bid, executed and delivered a deed in fee-simple for the said property to the said Polk and Hogan, which deed bore date September 9, 1850, and after the delivery of said deed to said Polk and Hogan, and on October 18, 1853, they and their wives, by their deed of that date, conveyed the said property in fee-simple to the defendant.

The referee further found that at the date of said last mentioned deed the defendant was in possession of the property therein described and conveyed, and, with the knowledge of the said Childs, had ever since that date held the possession thereof as absolute owner, and had held and used the same for the purposes mentioned in said charter; nor did the defendant receive or hold the possession of the said premises in trust or for the benefit or use of said Nathaniel Childs; and the referee found, as a fact, that ever since about the date of said deed of said Polk and Hogan to defendant, and for more than twenty years prior to the commencement of this suit, the defendant had held the actual, open, and notorious possession of the said premises described in said deed and in said second count, and had claimed the same as absolute owner, and adversely to all other persons whomsoever, and that said adverse possession had been continuous from the beginning until the present time.

The referee further found that the said Nathaniel Childs, on December 9, 1873, by deed of that date, conveyed all his estate and interest in the said premises described in said count to the plaintiff.

The referee further found, as to both the counts in the plaintiff's petition, that the said Nathaniel Childs, soon after his acquisition of the two parcels of land therein described, established a cemetery thereon, which was known as the Wesleyan Cemetery, and which was used for the

benefit of the Centenary Church, before the title of the said land was vested in defendant, as set forth in the report; and that the said Childs, before the title was so vested in defendant, subdivided the whole of the said land acquired, as aforesaid, from said Briggs, and the greater portion of that acquired from the said Ranken, into burial lots, and sold lots and permits for burial purposes in said cemetery.

The referee found and decided that no title to the premises described therein was conveyed to the plaintiff by the deed of said Nathaniel Childs to him, of the date of December 9, 1873, above referred to, except as to the lots 5, 6, 7, and 8, in block No. 6, therein reserved and excepted.

The referee accordingly decided that the appellant was not entitled to any relief under his petition, and that the suit ought to be dismissed. The appellant filed various exceptions to the report, but these were overruled, the report confirmed, and judgment rendered against the appellant, who thereupon appealed to this court.

It is contended by the appellant, in the first place, that the referee erred in finding that by the deed of December 5, 1853, the title passed out of Childs, without any reservation, or any beneficial interest remaining in Childs. The appellant contends that it was the intention of the grantor that upon the discontinuance of the particular use, the estate of the respondent in the property should cease and determine. But in order to arrive at the intention we must consider not only the language of this deed, but that of the agreements of April 29, 1849, and September 4, 1850, and all the circumstances surrounding the transaction. From the testimony of N. Childs himself, it would appear that his first project was to devise a means by which money could be raised for the Centenary Church. That society was building, and in need of funds, and it occurred to Childs, looking at things from a business point of view, not so much that the church needed a graveyard as that it needed money. Some old cemetery had been abandoned,

and it struck him that it would be a good plan for the church to raise funds by establishing a new one. The primary object seems to have been to secure a source of revenue for the Centenary Church, and a graveyard was hit upon as a means. It is evident that the success of such an enterprise depended on the coöperation of other parties. It was expected that those interested in the church would pay their money for burial rights and for lots. This they would not do for the benefit of Childs, but would do for the benefit of the church; so that there were, not only nominally, but really, two parties to the arrangement. It was not a mere case of gift or donation, though it had some of the elements of such. Childs bought the tracts of land, and the parishioners, it would appear, purchased lots upon the understanding that in so doing they were aiding the Centenary Church, to which the funds went, and to which the parishioners were led, by the acts of Childs, to consider the property as belonging. The agreements of April 27, 1849, and December 4, 1850, strikingly confirm these views. The deed of December 5, 1853, must be considered in reference to these agreements. When so considered, many of the arguments of the appellant are answered. The first agreement relates to both tracts, as does also the second. By the first, Childs was to be reimbursed the full amount due him upon the tracts, with legal interest and all costs and expenses, and then to convey the land. The source from which the money was to come to him is distinctly stated. Equity must regard the essential nature of the transaction, and, so regarding it, must pronounce that it was not unilateral, nor the consideration nominal. Both of the agreements imply carefully arranged bargains, minute details of which are expressed in one case, in order to secure payments to Childs. It is in reference to these terms that the deed must be considered. But, whether we consider agreements or deed, we find no words indicating an intention to reserve rights. In these agreements the full under-

standing is expressed that the property was purchased as, has been held as, and intended to be the property of the church. Language like this must certainly have its fair meaning put upon it. The idea is to benefit the church by a complete transfer of the property, on certain terms, however, of payments being made to Childs. The designation of a society for whose benefit the property was secondarily to be ; the conditional nature of the conveyance, only to be made on payment of the money to reimburse the grantor; the feature of the transaction, above alluded to, by which those interested in the church are made, essentially, parties to the contract ; the expression of the position of trust which Childs held, and had held, as managing the property for the benefit of the church, are affirmative indications, speaking even more forcibly than the absence of any express words, denoting intention to reserve rights in the property. It is true that the belief and expectation on both sides was, undoubtedly, that the property should be used for the purpose of a cemetery. But it must be borne in mind that it is one thing to say that Childs expected that the property would be so used, and another and a totally different thing to say that he reserved to himself the property in case such use should cease.

With good reason, equity holds that a trust will not be presumed, and that the proof of it should be clear. All implied trusts, especially between grantor and grantee, are not only impediments to the free passage of property, but tend to disturb that repose which the law favors, and which lies at the bottom of all rules of limitation. Even in cases of bequests, the tendency of recent decisions is to abstain from charging a gift with a trust, unless the language of the will is so clear and explicit as to leave no doubt of the intention of the testator. *Harding* v. *Glyn*, and notes, 2 White & Tudor's Ld. Cas., 4th ed., 2 [*946]. But where a consideration — even a nominal one — is paid, and no uses are expressly declared, the grantee will take the whole use.

2 Story's Eq. Jur., sec. 1199. And it has been held that where a deed expresses a consideration, though a nominal one, and though it was never paid, no use results to the grantor, and parol proof that the conveyance was really in trust for the grantor is not admissible. *Leman* v. *Whitley*, 4 Russ. Ch. 423; *Hagan* v. *Jaques*, 19 N. J. Eq. 123. In the present case there is no evidence in writing inconsistent with the conclusion that the respondent was to take the entire estate. The appellant insists that all the deeds of lots in the cemetery contained a provision that the land should be used only for burial purposes, or otherwise be forfeited. This provision, as between Childs and the Centenary Church, on the one hand, and third parties, who might be perfect strangers to their plans, on the other, was essential to the sale of lots and burial rights, and to the acquisition of those profits which it was the object of both Childs and the church to secure. It proves — what there is no doubt of — that both intended that the ground should be used for burial purposes, and not for objects inconsistent with such purposes. Thus the written evidence, if taken together, as it must be, shows an intent to vest the entire use in the respondent. The parol evidence tends clearly to the same conclusion. In considering this, the coloring given to facts by theories formed long after the occurrences must be distinguished and discarded, and the events looked at as they occurred at the time. If thus regarded, it can be seen that it was the common understanding before the sale under the deed of trust that the tracts were the property of the trustees, subject only to the execution of conditions which subsequently were performed. "It was no new acquisition at that time," says the witness Gay, referring to the period when the agreement of September 4, 1850, was executed, which was prior to the sale under the deed of trust; "it was no new acquisition at that time, depending on new deeds from Childs; but seeing his misfortunes at the time, — his financial misfortunes I know noth-

ing of, — his name being identified with the property, and the title being in him up to that time, we were simply seeking to get a plain statement and showing of the actual state of the case, that the property, although it was in his name, was the property of the church. That (referring to the agreement) says so, signed by himself and us. That I learned from him in person." The proceedings of the church, as shown by the record of its trustees; the participation of Childs in those proceedings; his evident assent on occasions when, according to the maxim of equity, he ordered and directed if he did not dissent; the absence of satisfactory explanations as to matters which are inconsistent with the position that it was not the understanding that the complete estate was to pass, are points arising under the parol evidence confirmatory of the conclusions which must be drawn from the writings.

The events which show the intention of the parties and the character of the transaction occurred at an earlier date than the organization of the respondent, or the drawing up of its charter; and the conditions of this throw but little light on the questions that are most material. If the respondent is holding property contrary to the terms of its charter, exceeding its powers or violating its duties as prescribed by the law which created it, such violation cannot confer upon the appellant rights which he would not otherwise possess. He can invoke the aid of a court of equity only by showing a use reserved to him. If the equitable title is in the trustees, equity will not assist the appellant.

By the instrument of April 27, 1849, Childs agreed, on the conditions there specified, to convey the " Ranken tract," as well as the other property, but the former was not conveyed. Under the deed of trust given by Childs to Ranken, to secure part of the purchase-money, the property described in the second count was sold on September 9, 1850, and purchased by Trusten Polk and John Hogan, as trustees for the Centenary Church, and these trustees, by

deed of date October 18, 1853, recorded on January 1, 1855, conveyed this property to the respondent. The deed executed by the trustee in the deed of trust under which the sale was made was lost, and was never recorded. The respondent gave oral testimony as to the sale under the deed of trust, and as to the trustee's deed to Polk and Hogan. The appellant contends that there is no evidence sufficient to prove that any such sale took place. It is true that the recollection of the witnesses is at fault in regard to the particulars of the sale, but that there was a sale under the deed of trust is evident. The events which subsequently occurred would not have taken place unless there was a sale, except on the supposition that there was a conspiracy, and that a concerted plan of fraud was carried out. Why should this be supposed? Is there any thing improbable in a sale taking place at the court-house door, under a deed of trust? At a meeting of the trustees, of date September 9, 1850, as shown by their record, a committee reported that they had on that day attended the sale, and bid off the land in the name of the trustees, etc. The report was approved, and the committee was authorized to execute any loan they might be able to make to satisfy the amount of the purchase made that day, etc. A note was given by the trustees, and subsequently paid. Afterwards, Polk and Hogan made their deed to the respondent, which, it is presumed, they would not have done unless there had been a sale and a deed made to them. Compared with these and other facts, the testimony of Childs, who merely says he never heard of a sale, amounts to nothing. It is complained, also, that there were irregularities in the sale, and in the trustee's deed under it. But these irregularities, even if they had existed, would not avail the appellant in this suit. They could not give him any equities in the property, when the nature of the agreements of April 27, 1849, and September 4, 1850, is considered. By the former, Childs bound himself, on his being paid the amounts in it specified, immediately to

convey the two tracts of land ; and, as against him, specific performance of this agreement could have been enforced. Out of the proceeds of sales made by him of lots in the cemetery the sums he had paid on account of his purchase of the "Ranken tract," and in the management and improvement of it, had been paid to him by the church. The contract of September 4, 1850, will bear no such interpretation as the appellant attempts to put upon it. The proceedings of the trustees immediately preceding the making of this agreement, in which Childs took part, and to which proceedings the name of Childs is signed as secretary, show that the debt due the estate of Ranken, as the last payment on that part of the cemetery ground, was regarded as the debt of the church. The proceedings are on the basis that the church owned the cemetery, and was liable for the debts due upon it ; Childs is treated as an agent, who may be continued in charge or removed from the management of the grounds at pleasure ; a committee is appointed to make a loan to pay off the debt on the cemetery ground, " and to take such conveyance as they may deem best to receive the title to the ground to the best advantage." The agreement immediately follows, and, proceeding upon the same basis, assumes that the property belongs to the church ; that the notes specified are to be paid by the church, — as they afterwards were, — and Childs saved harmless from them, and that a formal transfer of the property is to follow as a matter of course. Under these agreements the equities were already vested in the church as against Childs, and the sale under the deed of trust merely passed the legal title. There is no foundation for the position that as against the acts and consent of Childs, as shown by these proceedings, which took place more than twenty years ago, his grantee is now entitled to affirmative relief from a court of equity, to secure him in the establishment of rights which Childs voluntarily parted with, and for the transfer of which he received and kept the consideration. The sale under the deed of trust

would not deprive him of rights, except on the supposition that he intended to violate the agreements he had made. This sale took place only five days after the date of the last agreement; and it may be fairly inferred from the evidence that this method of closing out the legal title and vesting it in the trustees — where it was agreed by the parties to be placed, and where accordingly, in the eye of equity, it already stood — was regarded at the time, by all concerned, as the natural result of the previous proceedings.

As by the deed of December 5, 1853, and the sale under the deed of trust, and the trustee's deed to Polk and Hogan, the title to all of the land in controversy passed out of N. Childs, without reservation, it is not necessary to consider the claim founded upon adverse possession, or the manner in which the property has been used by the respondent.

The judgment of the court below is affirmed. All the judges concur.